1　GEORGE G. WEICKHARDT (SBN 58586)
**ROPERS, MAJESKI, KOHN & BENTLEY PC**
2　201 Spear Street, Suite 1000
San Francisco, CA 94105
3　Telephone:　(415) 543-4800
Facsimile:　(415) 972-6301
4　Email:　　　gweickhardt@rmkb.com

5　Attorneys for Defendant
CHASE BANK USA, N.A., as successor-in-interest to
6　FIRST USA BANK, N.A. and BANK ONE
CARDMEMBER SERVICES

7

8　　　　　　　　　UNITED STATES DISTRICT COURT

9　　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

10　　　　　　　　　　SAN FRANCISCO DIVISION

11

12　ERIC ROBERT DREW,　　　　　　　CASE NO.  C07 0726 SI

13　　　　　　　Plaintiff,

14　　　v.　　　　　　　　　　　　　**REQUEST FOR JUDICIAL NOTICE
　　　　　　　　　　　　　　　　　AND REPLY DECLARATION OF G.
　　　　　　　　　　　　　　　　　WEICKHARDT IN SUPPORT OF**
15　EQUIFAX INFORMATION SERVICES,　**MOTION FOR SUMMARY**
LLC, EXPERIAN INFORMATION　　　**JUDGMENT**
16　SOLUTIONS, INC., TRANSUNION LLC,
NCAC, BANK OF AMERICA, FLEET　**Date:　　　July 18, 2008**
17　CREDIT CARD SERVICE, AT&T　　　**Time:　　　9:00 a.m.**
UNIVERSAL CARD SERVICES,　　　**Judge:　　　The Hon. Susan Illston**
18　CITIGROUP, BANK ONE
CARDMEMBER SERVICES, FIRST USA
19　BANK, N.A. and DOES 1-100,

20　　　　　　　Defendants.

21

22　　　　I, GEORGE G. WEICKHARDT, declare as follows:

23　　　　1.　　I am an attorney at law duly authorized to practice before this Court, and I am a

24　employed at the law firm of Ropers, Majeski, Kohn & Bentley, PC, counsel of record for

25　Defendant CHASE BANK USA, N.A. ("Chase"), as successor-in-interest to FIRST USA BANK,

26　N.A. and BANK ONE CARDMEMBER SERVICES, in the above-entitled action.  I have

27　personal knowledge of the matters contained in this declaration and, if called as a witness to

28　testify, I could and would competently testify to them.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    2.    Attached hereto as Exhibit A, in support of Chase's motion for summary

2    judgment, is a true and correct copy of the American Psychological Association's Ethical

3    Principles of Psychologists and Code of Conduct, *Assessment, Bases for Assessments*, § 9.01.

4    The full Code of Conduct is available at http://www.apa.org/ethics/ code2002.html.  The website

5    was last accessed and the Code downloaded on June 30, 2008.

6        3.    The Court is requested to take Judicial Notice of Exhibit A.

7        4.    The exhibits to the Declaration of John Keating, purportedly filed with the

8    opposition to the motion for summary judgment have never been served on me, nor on Jon as I

9    can tell, filed with the Court.

10        5.    Attached hereto as Exhibit B are the following pages from Vol. I. of the deposition

11    of Eric Drew:15,16,53,69.

12        6.    Attached hereto as Exhibit C are the following pages from Vol. I. of the deposition

13    of Evan Hendricks: 41,43.

14        7.    Attached hereto as Exhibit D is the Disclosure of Experts served by plaintiff's

15    counsel on April 1, 2008.

16        I declare under penalty of perjury under the laws of the United States of America that the

17    foregoing is true and correct and that this declaration was executed in San Francisco, California,

18    on July 7, 2008.

19

20                                          GEORGE G. WEICKHARDT

21

22

23

24

25

26

27

28

USDC NDCA No. C07 0726 SI                           - 2 -                REQUEST FOR JUDICIAL NOTICE AND
RC1/5143785.1/WK1                                                       DECLARATION OF GEORGE G. WEICKHARDT

# EXHIBIT A

# Ethical Principles of Psychologists and Code Of Conduct
## 2002

<u>History and Effective Date Footnote</u>

## CONTENTS

INTRODUCTION AND APPLICABILITY

PREAMBLE

GENERAL PRINCIPLES

Principle A: Beneficence and
    Nonmaleficence
Principle B: Fidelity and
    Responsibility
Principle C: Integrity
Principle D: Justice
Principle E: Respect for People's
    Rights and Dignity

ETHICAL STANDARDS

*1.  Resolving Ethical Issues*
1.01 Misuse of Psychologists' Work
1.02 Conflicts Between Ethics and
Law, Regulations, or Other
Governing Legal Authority
1.03 Conflicts Between Ethics and
Organizational Demands
1.04 Informal Resolution of Ethical
Violations
1.05 Reporting Ethical Violations
1.06 Cooperating With Ethics
Committees
1.07 Improper Complaints
1.08 Unfair Discrimination Against
Complainants and Respondents

*2.  Competence*
2.01 Boundaries of Competence
2.02 Providing Services in
Emergencies
2.03 Maintaining Competence
2.04 Bases for Scientific and
Professional Judgments
2.05 Delegation of Work to Others
2.06 Personal Problems and Conflicts

*3.  Human Relations*
3.01 Unfair Discrimination
3.02 Sexual Harassment
3.03 Other Harassment
3.04 Avoiding Harm
3.05 Multiple Relationships
3.06 Conflict of Interest
3.07 Third-Party Requests for
Services
3.08 Exploitative Relationships
3.09 Cooperation With Other
Professionals
3.10 Informed Consent
3.11 Psychological Services
Delivered To or Through
Organizations

3.12 Interruption of Psychological
Services

*4.  Privacy And Confidentiality*
4.01 Maintaining Confidentiality
4.02 Discussing the Limits of
Confidentiality
4.03 Recording
4.04 Minimizing Intrusions on Privacy
4.05 Disclosures
4.06 Consultations
4.07 Use of Confidential Information
for Didactic or Other Purposes

*5.  Advertising and Other Public
    Statements*
5.01 Avoidance of False or Deceptive
Statements
5.02 Statements by Others
5.03 Descriptions of Workshops and
Non-Degree-Granting Educational
Programs
5.04 Media Presentations
5.05 Testimonials
5.06 In-Person Solicitation

*6.  Record Keeping and Fees*
6.01 Documentation of Professional
and Scientific Work and Maintenance
of Records
6.02 Maintenance, Dissemination,
and Disposal of Confidential Records
of Professional and Scientific Work
6.03 Withholding Records for
Nonpayment
6.04 Fees and Financial
Arrangements
6.05 Barter With Clients/Patients
6.06 Accuracy in Reports to Payors
and Funding Sources
6.07 Referrals and Fees

*7. Education and Training*
7.01 Design of Education and
Training Programs
7.02 Descriptions of Education and
Training Programs
7.03 Accuracy in Teaching
7.04 Student Disclosure of Personal
Information
7.05 Mandatory Individual or Group
Therapy
7.06 Assessing Student and
Supervisee Performance
7.07 Sexual Relationships With
Students and Supervisees

*8.  Research and Publication*
8.01 Institutional Approval
8.02 Informed Consent to Research
8.03 Informed Consent for Recording
Voices and Images in Research
8.04 Client/Patient, Student, and
Subordinate Research Participants
8.05 Dispensing With Informed
Consent for Research
8.06 Offering Inducements for
Research Participation
8.07 Deception in Research
8.08 Debriefing
8.09 Humane Care and Use of
Animals in Research
8.10 Reporting Research Results
8.11 Plagiarism
8.12 Publication Credit
8.13 Duplicate Publication of Data
8.14 Sharing Research Data for
Verification
8.15 Reviewers

*9.  Assessment*
9.01 Bases for Assessments
9.02 Use of Assessments
9.03 Informed Consent in
Assessments
9.04 Release of Test Data
9.05 Test Construction
9.06 Interpreting Assessment Results
9.07 Assessment by Unqualified
Persons
9.08 Obsolete Tests and Outdated
Test Results
9.09 Test Scoring and Interpretation
Services
9.10 Explaining Assessment Results
9.11. Maintaining Test Security

*10.  Therapy*
10.01 Informed Consent to Therapy
10.02 Therapy Involving Couples or
Families
10.03 Group Therapy
10.04 Providing Therapy to Those
Served by Others
10.05 Sexual Intimacies With Current
Therapy Clients/Patients
10.06 Sexual Intimacies With
Relatives or Significant Others of
Current Therapy Clients/Patients
10.07 Therapy With Former Sexual
Partners
10.08 Sexual Intimacies With Former
Therapy Clients/Patients
10.09 Interruption of Therapy
10.10 Terminating Therapy

## INTRODUCTION AND APPLICABILITY

The American Psychological Association's (APA's) Ethical Principles of Psychologists and Code of Conduct (hereinafter referred to as the Ethics Code) consists of an Introduction, a Preamble, five General Principles (A – E), and specific Ethical Standards. The Introduction discusses the intent, organization, procedural considerations, and scope of application of the Ethics Code. The Preamble and General Principles are aspirational goals to guide psychologists toward the highest ideals of psychology. Although the Preamble and General Principles are not themselves enforceable rules, they should be considered by psychologists in arriving at an ethical course of action. The Ethical Standards set forth enforceable rules for conduct as psychologists. Most of the Ethical Standards are written broadly, in order to apply to psychologists in varied roles, although the application of an Ethical Standard may vary depending on the context. The Ethical Standards are not exhaustive. The fact that a given conduct is not specifically addressed by an Ethical Standard does not mean that it is necessarily either ethical or unethical.

This Ethics Code applies only to psychologists' activities that are part of their scientific, educational, or professional roles as psychologists. Areas covered include but are not limited to the clinical, counseling, and school practice of psychology; research; teaching; supervision of trainees; public service; policy development; social intervention; development of assessment instruments; conducting assessments; educational counseling; organizational consulting; forensic activities; program design and evaluation; and administration. This Ethics Code applies to these activities across a variety of contexts, such as in person, postal, telephone, internet, and other electronic transmissions.  These activities shall be distinguished from the purely private conduct of psychologists, which is not within the purview of the Ethics Code.

Membership in the APA commits members and student affiliates to comply with the standards of the APA Ethics Code and to the rules and procedures used to enforce them.  Lack of awareness or misunderstanding of an Ethical Standard is not itself a defense to a charge of unethical conduct.

The procedures for filing, investigating, and resolving complaints of unethical conduct are described in the current Rules and Procedures of the APA Ethics Committee.  APA may impose sanctions on its members for violations of the standards of the Ethics Code, including termination of APA membership, and may notify other bodies and individuals of its actions. Actions that violate the standards of the Ethics Code may also lead to the imposition of sanctions on psychologists or students whether or not they are APA members by bodies other than APA, including state psychological associations, other professional groups, psychology boards, other state or federal agencies, and payors for health services.  In addition, APA may take action against a member after his or her conviction of a felony, expulsion or suspension from an affiliated state psychological association, or suspension or loss of licensure. When the sanction to be imposed by APA is less than expulsion, the 2001 Rules and Procedures do not guarantee an opportunity for an in-person hearing, but generally provide that complaints will be resolved only on the basis of a submitted record.

The Ethics Code is intended to provide guidance for psychologists and standards of professional conduct that can be applied by the APA and by other bodies that choose to adopt them.  The Ethics Code is not intended to be a basis of civil liability.  Whether a psychologist has violated the Ethics Code standards does not by itself determine whether the psychologist is legally liable in a court action, whether a contract is enforceable, or whether other legal consequences occur.

The modifiers used in some of the standards of this Ethics Code (e.g., *reasonably, appropriate, potentially*) are included in the standards when they would (1) allow professional judgment on the part of psychologists, (2) eliminate injustice or inequality that would occur without the modifier, (3) ensure applicability across the broad range of activities conducted by psychologists, or (4) guard against a set of rigid rules that might be quickly outdated. As used in this Ethics Code, the term *reasonable* means the prevailing professional judgment of psychologists engaged in similar activities in similar circumstances, given the knowledge the psychologist had or should have had at the time.

In the process of making decisions regarding their professional behavior, psychologists must consider this Ethics Code in addition to applicable laws and psychology board regulations.  In applying the Ethics Code to their professional work, psychologists may consider other materials and guidelines that have been adopted or endorsed by scientific and professional psychological organizations and the dictates of their own conscience, as well as consult with others within the field. If this Ethics Code establishes a higher standard of conduct than is required by law, psychologists must meet the higher ethical standard. If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to this Ethics Code and take steps to resolve the conflict in a responsible manner. If the conflict is unresolvable via such means, psychologists may adhere to the requirements of the law, regulations, or other governing authority in keeping with basic principles of human rights.

# PREAMBLE

Psychologists are committed to increasing scientific and professional knowledge of behavior and people's understanding of themselves and others and to the use of such knowledge to improve the condition of individuals, organizations, and society. Psychologists respect and protect civil and human rights and the central importance of freedom of inquiry and expression in research, teaching, and publication. They strive to help the public in developing informed judgments and choices concerning human behavior. In doing so, they perform many roles, such as researcher, educator, diagnostician, therapist, supervisor, consultant, administrator, social interventionist, and expert witness. This Ethics Code provides a common set of principles and standards upon which psychologists build their professional and scientific work.

This Ethics Code is intended to provide specific standards to cover most situations encountered by psychologists. It has as its goals the welfare and protection of the individuals and groups with whom psychologists work and the education of members, students, and the public regarding ethical standards of the discipline.

The development of a dynamic set of ethical standards for psychologists' work-related conduct requires a personal commitment and lifelong effort to act ethically; to encourage ethical behavior by students, supervisees, employees, and colleagues; and to consult with others concerning ethical problems.

# GENERAL PRINCIPLES

This section consists of General Principles. General Principles, as opposed to Ethical Standards, are aspirational in nature. Their intent is to guide and inspire psychologists toward the very highest ethical ideals of the profession. General Principles, in contrast to Ethical Standards, do not represent obligations and should not form the basis for imposing sanctions. Relying upon General Principles for either of these reasons distorts both their meaning and purpose.

## Principle A: Beneficence and Nonmaleficence

Psychologists strive to benefit those with whom they work and take care to do no harm. In their professional actions, psychologists seek to safeguard the welfare and rights of those with whom they interact professionally and other affected persons, and the welfare of animal subjects of research. When conflicts occur among psychologists' obligations or concerns, they attempt to resolve these conflicts in a responsible fashion that avoids or minimizes harm. Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence. Psychologists strive to be aware of the possible effect of their own physical and mental health on their ability to help those with whom they work.

## Principle B: Fidelity and Responsibility

Psychologists establish relationships of trust with those with whom they work. They are aware of their professional and scientific responsibilities to society and to the specific communities in which they work. Psychologists uphold professional standards of conduct, clarify their professional roles and obligations, accept appropriate responsibility for their behavior, and seek to manage conflicts of interest that could lead to exploitation or harm. Psychologists consult with, refer to, or cooperate with other professionals and institutions to the extent needed to serve the best interests of those with whom they work. They are concerned about the ethical compliance of their colleagues' scientific and professional conduct. Psychologists strive to contribute a portion of their professional time for little or no compensation or personal advantage.

## Principle C: Integrity

Psychologists seek to promote accuracy, honesty, and truthfulness in the science, teaching, and practice of psychology. In these activities psychologists do not steal, cheat, or engage in fraud, subterfuge, or intentional misrepresentation of fact. Psychologists strive to keep their promises and to avoid unwise or unclear commitments. In situations in which deception may be ethically justifiable to maximize benefits and minimize harm, psychologists have a serious obligation to consider the need for, the possible consequences of, and their responsibility to correct any resulting mistrust or other harmful effects that arise from the use of such techniques.

## Principle D: Justice

Psychologists recognize that fairness and justice entitle all persons to access to and benefit from the contributions of psychology and to equal quality in the processes, procedures, and services being conducted by psychologists. Psychologists exercise reasonable judgment and take precautions to ensure that their potential biases, the boundaries of their competence, and the limitations of their expertise do not lead to or condone unjust practices.

**Principle E: Respect for People's Rights and Dignity**

Psychologists respect the dignity and worth of all people, and the rights of individuals to privacy, confidentiality, and self-determination. Psychologists are aware that special safeguards may be necessary to protect the rights and welfare of persons or communities whose vulnerabilities impair autonomous decision making. Psychologists are aware of and respect cultural, individual, and role differences, including those based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status and consider these factors when working with members of such groups. Psychologists try to eliminate the effect on their work of biases based on those factors, and they do not knowingly participate in or condone activities of others based upon such prejudices.

**ETHICAL STANDARDS**

**1. Resolving Ethical Issues**

**1.01 Misuse of Psychologists' Work**
If psychologists learn of misuse or misrepresentation of their work, they take reasonable steps to correct or minimize the misuse or misrepresentation.

**1.02 Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority**
If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to the Ethics Code and take steps to resolve the conflict. If the conflict is unresolvable via such means, psychologists may adhere to the requirements of the law, regulations, or other governing legal authority.

**1.03 Conflicts Between Ethics and Organizational Demands**
If the demands of an organization with which psychologists are affiliated or for whom they are working conflict with this Ethics Code, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and to the extent feasible, resolve the conflict in a way that permits adherence to the Ethics Code.

**1.04 Informal Resolution of Ethical Violations**
When psychologists believe that there may have been an ethical violation by another psychologist, they attempt to resolve the issue by bringing it to the attention of that individual, if an informal resolution appears appropriate and the intervention does not violate any confidentiality rights that may be involved. (See also Standards 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority, and 1.03, Conflicts Between Ethics and Organizational Demands.)

**1.05 Reporting Ethical Violations**
If an apparent ethical violation has substantially harmed or is likely to substantially harm a person or organization and is not appropriate for informal resolution under Standard 1.04, Informal Resolution of Ethical Violations, or is not resolved properly in that fashion, psychologists take further action appropriate to the situation. Such action might include referral to state or national committees on professional ethics, to state licensing boards, or to the appropriate institutional authorities. This standard does not apply when an intervention would violate confidentiality rights or when psychologists have been retained to review the work of another psychologist whose professional conduct is in question. (See also Standard 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority.)

**1.06 Cooperating With Ethics Committees**
Psychologists cooperate in ethics investigations, proceedings, and resulting requirements of the APA or any affiliated state psychological association to which they belong. In doing so, they address any confidentiality issues. Failure to cooperate is itself an ethics violation. However, making a request for deferment of adjudication of an ethics complaint pending the outcome of litigation does not alone constitute noncooperation.

**1.07 Improper Complaints**
Psychologists do not file or encourage the filing of ethics complaints that are made with reckless disregard for or willful ignorance of facts that would disprove the allegation.

**1.08 Unfair Discrimination Against Complainants and Respondents**
Psychologists do not deny persons employment, advancement, admissions to academic or other programs, tenure, or promotion, based solely upon their having made or their being the subject of an ethics complaint. This does not preclude taking action based upon the outcome of such proceedings or considering other appropriate information.

**2. Competence**

**2.01 Boundaries of Competence**
(a) Psychologists provide services, teach, and conduct research with populations and in areas only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

(b) Where scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status is essential for effective implementation of their services or research, psychologists have or obtain the training, experience, consultation, or supervision necessary to ensure the competence of their services, or they make appropriate referrals, except as provided in Standard 2.02, Providing Services in Emergencies.

(c) Psychologists planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies new to them undertake relevant education, training, supervised experience, consultation, or study.

(d) When psychologists are asked to provide services to individuals for whom appropriate mental health services are not available and for which psychologists have not obtained the competence necessary, psychologists with closely related prior training or experience may provide such services in order to ensure that services are not denied if they make a reasonable effort to obtain the competence required by using relevant research, training, consultation, or study.

(e) In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect clients/patients, students, supervisees, research participants, organizational clients, and others from harm.

(f) When assuming forensic roles, psychologists are or become reasonably familiar with the judicial or administrative rules governing their roles.

**2.02 Providing Services in Emergencies**
In emergencies, when psychologists provide services to individuals for whom other mental health services are not available and for which psychologists have not obtained the necessary training, psychologists may provide such services in order to ensure that services are not denied. The services are discontinued as soon as the emergency has ended or appropriate services are available.

**2.03 Maintaining Competence**
Psychologists undertake ongoing efforts to develop and maintain their competence.

**2.04 Bases for Scientific and Professional Judgments**
Psychologists' work is based upon established scientific and professional knowledge of the discipline. (See also Standards 2.01e, Boundaries of Competence, and 10.01b, Informed Consent to Therapy.)

**2.05 Delegation of Work to Others**
Psychologists who delegate work to employees, supervisees, or research or teaching assistants or who use the services of others, such as interpreters, take reasonable steps to (1) avoid delegating such work to persons who have a multiple relationship with those being served that would likely lead to exploitation or loss of objectivity; (2) authorize only those responsibilities that such persons can be expected to perform competently on the basis of their education, training, or experience, either independently or with the level of supervision being provided; and (3) see that such persons perform these services competently. (See also Standards 2.02, Providing Services in Emergencies; 3.05, Multiple Relationships; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.02, Use of Assessments; 9.03, Informed Consent in Assessments; and 9.07, Assessment by Unqualified Persons.)

**2.06 Personal Problems and Conflicts**
(a) Psychologists refrain from initiating an activity when they know or should know that there is a substantial likelihood that their personal problems will prevent them from performing their work-related activities in a competent manner.

(b) When psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance, and determine whether they should limit, suspend, or terminate their work-related duties. (See also Standard 10.10, Terminating Therapy.)

**3.  Human Relations**

**3.01 Unfair Discrimination**
In their work-related activities, psychologists do not engage in unfair discrimination based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, socioeconomic status, or any basis proscribed by law.

**3.02 Sexual Harassment**
Psychologists do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, that occurs in connection with the psychologist's activities or roles as a psychologist, and that either (1) is unwelcome, is offensive, or creates a hostile workplace or educational environment, and the psychologist knows or is told this or (2) is sufficiently severe or intense to be abusive to a reasonable person in

the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts. (See also Standard 1.08, Unfair Discrimination Against Complainants and Respondents.)

### 3.03 Other Harassment
Psychologists do not knowingly engage in behavior that is harassing or demeaning to persons with whom they interact in their work based on factors such as those persons' age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status.

### 3.04 Avoiding Harm
Psychologists take reasonable steps to avoid harming their clients/patients, students, supervisees, research participants, organizational clients, and others with whom they work, and to minimize harm where it is foreseeable and unavoidable.

### 3.05 Multiple Relationships
(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person, (2) at the same time is in a relationship with a person closely associated with or related to the person with whom the psychologist has the professional relationship, or (3) promises to enter into another relationship in the future with the person or a person closely associated with or related to the person.

A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists.

Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

(c) When psychologists are required by law, institutional policy, or extraordinary circumstances to serve in more than one role in judicial or administrative proceedings, at the outset they clarify role expectations and the extent of confidentiality and thereafter as changes occur. (See also Standards 3.04, Avoiding Harm, and 3.07, Third-Party Requests for Services.)

### 3.06 Conflict of Interest
Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

### 3.07 Third-Party Requests for Services
When psychologists agree to provide services to a person or entity at the request of a third party, psychologists attempt to clarify at the outset of the service the nature of the relationship with all individuals or organizations involved. This clarification includes the role of the psychologist (e.g., therapist, consultant, diagnostician, or expert witness), an identification of who is the client, the probable uses of the services provided or the information obtained, and the fact that there may be limits to confidentiality. (See also Standards 3.05, Multiple Relationships, and 4.02, Discussing the Limits of Confidentiality.)

### 3.08 Exploitative Relationships
Psychologists do not exploit persons over whom they have supervisory, evaluative, or other authority such as clients/patients, students, supervisees, research participants, and employees. (See also Standards 3.05, Multiple Relationships; 6.04, Fees and Financial Arrangements; 6.05, Barter With Clients/Patients; 7.07, Sexual Relationships With Students and Supervisees; 10.05, Sexual Intimacies With Current Therapy Clients/Patients; 10.06, Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients; 10.07, Therapy With Former Sexual Partners; and 10.08, Sexual Intimacies With Former Therapy Clients/Patients.)

### 3.09 Cooperation With Other Professionals
When indicated and professionally appropriate, psychologists cooperate with other professionals in order to serve their clients/patients effectively and appropriately. (See also Standard 4.05, Disclosures.)

### 3.10 Informed Consent
(a) When psychologists conduct research or provide assessment, therapy, counseling, or consulting services in person or via electronic transmission or other forms of communication, they obtain the informed consent of the individual or individuals using language that is reasonably understandable to that person or persons except when conducting such activities without consent is mandated by law or governmental regulation or as otherwise provided in this Ethics Code.

(See also Standards 8.02, Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

(b) For persons who are legally incapable of giving informed consent, psychologists nevertheless (1) provide an appropriate explanation, (2) seek the individual's assent, (3) consider such persons' preferences and best interests, and (4) obtain appropriate permission from a legally authorized person, if such substitute consent is permitted or required by law. When consent by a legally authorized person is not permitted or required by law, psychologists take reasonable steps to protect the individual's rights and welfare.

(c) When psychological services are court ordered or otherwise mandated, psychologists inform the individual of the nature of the anticipated services, including whether the services are court ordered or mandated and any limits of confidentiality, before proceeding.

(d) Psychologists appropriately document written or oral consent, permission, and assent. (See also Standards 8.02, Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

### 3.11 Psychological Services Delivered To or Through Organizations
(a) Psychologists delivering services to or through organizations provide information beforehand to clients and when appropriate those directly affected by the services about (1) the nature and objectives of the services, (2) the intended recipients, (3) which of the individuals are clients, (4) the relationship the psychologist will have with each person and the organization, (5) the probable uses of services provided and information obtained, (6) who will have access to the information, and (7) limits of confidentiality. As soon as feasible, they provide information about the results and conclusions of such services to appropriate persons.

(b) If psychologists will be precluded by law or by organizational roles from providing such information to particular individuals or groups, they so inform those individuals or groups at the outset of the service.

### 3.12 Interruption of Psychological Services
Unless otherwise covered by contract, psychologists make reasonable efforts to plan for facilitating services in the event that psychological services are interrupted by factors such as the psychologist's illness, death, unavailability, relocation, or retirement or by the client's/patient's relocation or financial limitations. (See also Standard 6.02c, Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work.)

### 4. <u>Privacy And Confidentiality</u>

### 4.01 Maintaining Confidentiality
Psychologists have a primary obligation and take reasonable precautions to protect confidential information obtained through or stored in any medium, recognizing that the extent and limits of confidentiality may be regulated by law or established by institutional rules or professional or scientific relationship. (See also Standard 2.05, Delegation of Work to Others.)

### 4.02 Discussing the Limits of Confidentiality
(a) Psychologists discuss with persons (including, to the extent feasible, persons who are legally incapable of giving informed consent and their legal representatives) and organizations with whom they establish a scientific or professional relationship (1) the relevant limits of confidentiality and (2) the foreseeable uses of the information generated through their psychological activities. (See also Standard 3.10, Informed Consent.)

(b) Unless it is not feasible or is contraindicated, the discussion of confidentiality occurs at the outset of the relationship and thereafter as new circumstances may warrant.

(c) Psychologists who offer services, products, or information via electronic transmission inform clients/patients of the risks to privacy and limits of confidentiality.

### 4.03 Recording
Before recording the voices or images of individuals to whom they provide services, psychologists obtain permission from all such persons or their legal representatives. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05, Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

### 4.04 Minimizing Intrusions on Privacy
(a) Psychologists include in written and oral reports and consultations, only information germane to the purpose for which the communication is made.

(b) Psychologists discuss confidential information obtained in their work only for appropriate scientific or professional purposes and only with persons clearly concerned with such matters.

**4.05 Disclosures**
(a) Psychologists may disclose confidential information with the appropriate consent of the organizational client, the individual client/patient, or another legally authorized person on behalf of the client/patient unless prohibited by law.

(b) Psychologists disclose confidential information without the consent of the individual only as mandated by law, or where permitted by law for a valid purpose such as to (1) provide needed professional services; (2) obtain appropriate professional consultations; (3) protect the client/patient, psychologist, or others from harm; or (4) obtain payment for services from a client/patient, in which instance disclosure is limited to the minimum that is necessary to achieve the purpose. (See also Standard 6.04e, Fees and Financial Arrangements.)

**4.06 Consultations**
When consulting with colleagues, (1) psychologists do not disclose confidential information that reasonably could lead to the identification of a client/patient, research participant, or other person or organization with whom they have a confidential relationship unless they have obtained the prior consent of the person or organization or the disclosure cannot be avoided, and (2) they disclose information only to the extent necessary to achieve the purposes of the consultation. (See also Standard 4.01, Maintaining Confidentiality.)

**4.07 Use of Confidential Information for Didactic or Other Purposes**
Psychologists do not disclose in their writings, lectures, or other public media, confidential, personally identifiable information concerning their clients/patients, students, research participants, organizational clients, or other recipients of their services that they obtained during the course of their work, unless (1) they take reasonable steps to disguise the person or organization, (2) the person or organization has consented in writing, or (3) there is legal authorization for doing so.

**5.  Advertising and Other Public Statements**

**5.01 Avoidance of False or Deceptive Statements**
(a) Public statements include but are not limited to paid or unpaid advertising, product endorsements, grant applications, licensing applications, other credentialing applications, brochures, printed matter, directory listings, personal resumes or curricula vitae, or comments for use in media such as print or electronic transmission, statements in legal proceedings, lectures and public oral presentations, and published materials. Psychologists do not knowingly make public statements that are false, deceptive, or fraudulent concerning their research, practice, or other work activities or those of persons or organizations with which they are affiliated.

(b) Psychologists do not make false, deceptive, or fraudulent statements concerning (1) their training, experience, or competence; (2) their academic degrees; (3) their credentials; (4) their institutional or association affiliations; (5) their services; (6) the scientific or clinical basis for, or results or degree of success of, their services; (7) their fees; or (8) their publications or research findings.

(c) Psychologists claim degrees as credentials for their health services only if those degrees (1) were earned from a regionally accredited educational institution or (2) were the basis for psychology licensure by the state in which they practice.

**5.02 Statements by Others**
(a) Psychologists who engage others to create or place public statements that promote their professional practice, products, or activities retain professional responsibility for such statements.

(b) Psychologists do not compensate employees of press, radio, television, or other communication media in return for publicity in a news item. (See also Standard 1.01, Misuse of Psychologists' Work.)

(c) A paid advertisement relating to psychologists' activities must be identified or clearly recognizable as such.

**5.03 Descriptions of Workshops and Non-Degree-Granting Educational Programs**
To the degree to which they exercise control, psychologists responsible for announcements, catalogs, brochures, or advertisements describing workshops, seminars, or other non-degree-granting educational programs ensure that they accurately describe the audience for which the program is intended, the educational objectives, the presenters, and the fees involved.

**5.04 Media Presentations**
When psychologists provide public advice or comment via print, internet, or other electronic transmission, they take precautions to ensure that statements (1) are based on their professional knowledge, training, or experience in accord with appropriate psychological literature and practice; (2) are otherwise consistent with this Ethics Code; and (3) do not indicate that a professional relationship has been established with the recipient. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

**5.05 Testimonials**
Psychologists do not solicit testimonials from current therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence.

**5.06 In-Person Solicitation**
Psychologists do not engage, directly or through agents, in uninvited in-person solicitation of business from actual or potential therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence. However, this prohibition does not preclude (1) attempting to implement appropriate collateral contacts for the purpose of benefiting an already engaged therapy client/patient or (2) providing disaster or community outreach services.

**6.    Record Keeping and Fees**

**6.01 Documentation of Professional and Scientific Work and Maintenance of Records**
Psychologists create, and to the extent the records are under their control, maintain, disseminate, store, retain, and dispose of records and data relating to their professional and scientific work in order to (1) facilitate provision of services later by them or by other professionals, (2) allow for replication of research design and analyses, (3) meet institutional requirements, (4) ensure accuracy of billing and payments, and (5) ensure compliance with law. (See also Standard 4.01, Maintaining Confidentiality.)

**6.02 Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work**
(a) Psychologists maintain confidentiality in creating, storing, accessing, transferring, and disposing of records under their control, whether these are written, automated, or in any other medium. (See also Standards 4.01, Maintaining Confidentiality, and 6.01, Documentation of Professional and Scientific Work and Maintenance of Records.)

(b) If confidential information concerning recipients of psychological services is entered into databases or systems of records available to persons whose access has not been consented to by the recipient, psychologists use coding or other techniques to avoid the inclusion of personal identifiers.

(c) Psychologists make plans in advance to facilitate the appropriate transfer and to protect the confidentiality of records and data in the event of psychologists' withdrawal from positions or practice. (See also Standards 3.12, Interruption of Psychological Services, and 10.09, Interruption of Therapy.)

**6.03 Withholding Records for Nonpayment**
Psychologists may not withhold records under their control that are requested and needed for a client's/patient's emergency treatment solely because payment has not been received.

**6.04 Fees and Financial Arrangements**
(a) As early as is feasible in a professional or scientific relationship, psychologists and recipients of psychological services reach an agreement specifying compensation and billing arrangements.

(b) Psychologists' fee practices are consistent with law.

(c) Psychologists do not misrepresent their fees.

(d) If limitations to services can be anticipated because of limitations in financing, this is discussed with the recipient of services as early as is feasible. (See also Standards 10.09, Interruption of Therapy, and 10.10, Terminating Therapy.)

(e) If the recipient of services does not pay for services as agreed, and if psychologists intend to use collection agencies or legal measures to collect the fees, psychologists first inform the person that such measures will be taken and provide that person an opportunity to make prompt payment. (See also Standards 4.05, Disclosures; 6.03, Withholding Records for Nonpayment; and 10.01, Informed Consent to Therapy.)

**6.05 Barter With Clients/Patients**
Barter is the acceptance of goods, services, or other nonmonetary remuneration from clients/patients in return for psychological services. Psychologists may barter only if (1) it is not clinically contraindicated, and (2) the resulting arrangement is not exploitative. (See also Standards 3.05, Multiple Relationships, and 6.04, Fees and Financial Arrangements.)

**6.06 Accuracy in Reports to Payors and Funding Sources**
In their reports to payors for services or sources of research funding, psychologists take reasonable steps to ensure the accurate reporting of the nature of the service provided or research conducted, the fees, charges, or payments, and where applicable, the identity of the provider, the findings, and the diagnosis. (See also Standards 4.01, Maintaining Confidentiality; 4.04, Minimizing Intrusions on Privacy; and 4.05, Disclosures.)

**6.07 Referrals and Fees**
When psychologists pay, receive payment from, or divide fees with another professional, other than in an employer-employee relationship, the payment to each is based on the services provided (clinical, consultative, administrative, or other) and is not based on the referral itself. (See also Standard 3.09, Cooperation With Other Professionals.)

## 7. Education and Training

**7.01 Design of Education and Training Programs**
Psychologists responsible for education and training programs take reasonable steps to ensure that the programs are designed to provide the appropriate knowledge and proper experiences, and to meet the requirements for licensure, certification, or other goals for which claims are made by the program. (See also Standard 5.03, Descriptions of Workshops and Non-Degree-Granting Educational Programs.)

**7.02 Descriptions of Education and Training Programs**
Psychologists responsible for education and training programs take reasonable steps to ensure that there is a current and accurate description of the program content (including participation in required course- or program-related counseling, psychotherapy, experiential groups, consulting projects, or community service), training goals and objectives, stipends and benefits, and requirements that must be met for satisfactory completion of the program. This information must be made readily available to all interested parties.

**7.03 Accuracy in Teaching**
(a) Psychologists take reasonable steps to ensure that course syllabi are accurate regarding the subject matter to be covered, bases for evaluating progress, and the nature of course experiences. This standard does not preclude an instructor from modifying course content or requirements when the instructor considers it pedagogically necessary or desirable, so long as students are made aware of these modifications in a manner that enables them to fulfill course requirements. (See also Standard 5.01, Avoidance of False or Deceptive Statements.)

(b) When engaged in teaching or training, psychologists present psychological information accurately. (See also Standard 2.03, Maintaining Competence.)

**7.04 Student Disclosure of Personal Information**
Psychologists do not require students or supervisees to disclose personal information in course- or program-related activities, either orally or in writing, regarding sexual history, history of abuse and neglect, psychological treatment, and relationships with parents, peers, and spouses or significant others except if (1) the program or training facility has clearly identified this requirement in its admissions and program materials or (2) the information is necessary to evaluate or obtain assistance for students whose personal problems could reasonably be judged to be preventing them from performing their training- or professionally related activities in a competent manner or posing a threat to the students or others.

**7.05 Mandatory Individual or Group Therapy**
(a) When individual or group therapy is a program or course requirement, psychologists responsible for that program allow students in undergraduate and graduate programs the option of selecting such therapy from practitioners unaffiliated with the program. (See also Standard 7.02, Descriptions of Education and Training Programs.)

(b) Faculty who are or are likely to be responsible for evaluating students' academic performance do not themselves provide that therapy. (See also Standard 3.05, Multiple Relationships.)

**7.06 Assessing Student and Supervisee Performance**
(a) In academic and supervisory relationships, psychologists establish a timely and specific process for providing feedback to students and supervisees. Information regarding the process is provided to the student at the beginning of supervision.

(b) Psychologists evaluate students and supervisees on the basis of their actual performance on relevant and established program requirements.

**7.07 Sexual Relationships With Students and Supervisees**
Psychologists do not engage in sexual relationships with students or supervisees who are in their department, agency, or training center or over whom psychologists have or are likely to have evaluative authority. (See also Standard 3.05, Multiple Relationships.)

## 8.   Research and Publication

### 8.01 Institutional Approval
When institutional approval is required, psychologists provide accurate information about their research proposals and obtain approval prior to conducting the research. They conduct the research in accordance with the approved research protocol.

### 8.02 Informed Consent to Research
(a) When obtaining informed consent as required in Standard 3.10, Informed Consent, psychologists inform participants about (1) the purpose of the research, expected duration, and procedures; (2) their right to decline to participate and to withdraw from the research once participation has begun; (3) the foreseeable consequences of declining or withdrawing; (4) reasonably foreseeable factors that may be expected to influence their willingness to participate such as potential risks, discomfort, or adverse effects; (5) any prospective research benefits; (6) limits of confidentiality; (7) incentives for participation; and (8) whom to contact for questions about the research and research participants' rights. They provide opportunity for the prospective participants to ask questions and receive answers. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05, Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

(b) Psychologists conducting intervention research involving the use of experimental treatments clarify to participants at the outset of the research (1) the experimental nature of the treatment; (2) the services that will or will not be available to the control group(s) if appropriate; (3) the means by which assignment to treatment and control groups will be made; (4) available treatment alternatives if an individual does not wish to participate in the research or wishes to withdraw once a study has begun; and (5) compensation for or monetary costs of participating including, if appropriate, whether reimbursement from the participant or a third-party payor will be sought. (See also Standard 8.02a, Informed Consent to Research.)

### 8.03 Informed Consent for Recording Voices and Images in Research
Psychologists obtain informed consent from research participants prior to recording their voices or images for data collection unless (1) the research consists solely of naturalistic observations in public places, and it is not anticipated that the recording will be used in a manner that could cause personal identification or harm, or (2) the research design includes deception, and consent for the use of the recording is obtained during debriefing. (See also Standard 8.07, Deception in Research.)

### 8.04 Client/Patient, Student, and Subordinate Research Participants
(a) When psychologists conduct research with clients/patients, students, or subordinates as participants, psychologists take steps to protect the prospective participants from adverse consequences of declining or withdrawing from participation.

(b) When research participation is a course requirement or an opportunity for extra credit, the prospective participant is given the choice of equitable alternative activities.

### 8.05 Dispensing With Informed Consent for Research
Psychologists may dispense with informed consent only (1) where research would not reasonably be assumed to create distress or harm and involves (a) the study of normal educational practices, curricula, or classroom management methods conducted in educational settings; (b) only anonymous questionnaires, naturalistic observations, or archival research for which disclosure of responses would not place participants at risk of criminal or civil liability or damage their financial standing, employability, or reputation, and confidentiality is protected; or (c) the study of factors related to job or organization effectiveness conducted in organizational settings for which there is no risk to participants' employability, and confidentiality is protected or (2) where otherwise permitted by law or federal or institutional regulations.

### 8.06 Offering Inducements for Research Participation
(a) Psychologists make reasonable efforts to avoid offering excessive or inappropriate financial or other inducements for research participation when such inducements are likely to coerce participation.

(b) When offering professional services as an inducement for research participation, psychologists clarify the nature of the services, as well as the risks, obligations, and limitations. (See also Standard 6.05, Barter With Clients/Patients.)

### 8.07 Deception in Research
(a) Psychologists do not conduct a study involving deception unless they have determined that the use of deceptive techniques is justified by the study's significant prospective scientific, educational, or applied value and that effective nondeceptive alternative procedures are not feasible.

(b) Psychologists do not deceive prospective participants about research that is reasonably expected to cause physical pain or severe emotional distress.

(c) Psychologists explain any deception that is an integral feature of the design and conduct of an experiment to participants as early as is feasible, preferably at the conclusion of their participation, but no later than at the conclusion of the data collection, and permit participants to withdraw their data. (See also Standard 8.08, Debriefing.)

**8.08 Debriefing**
(a) Psychologists provide a prompt opportunity for participants to obtain appropriate information about the nature, results, and conclusions of the research, and they take reasonable steps to correct any misconceptions that participants may have of which the psychologists are aware.

(b) If scientific or humane values justify delaying or withholding this information, psychologists take reasonable measures to reduce the risk of harm.

(c) When psychologists become aware that research procedures have harmed a participant, they take reasonable steps to minimize the harm.

**8.09 Humane Care and Use of Animals in Research**
(a) Psychologists acquire, care for, use, and dispose of animals in compliance with current federal, state, and local laws and regulations, and with professional standards.

(b) Psychologists trained in research methods and experienced in the care of laboratory animals supervise all procedures involving animals and are responsible for ensuring appropriate consideration of their comfort, health, and humane treatment.

(c) Psychologists ensure that all individuals under their supervision who are using animals have received instruction in research methods and in the care, maintenance, and handling of the species being used, to the extent appropriate to their role. (See also Standard 2.05, Delegation of Work to Others.)

(d) Psychologists make reasonable efforts to minimize the discomfort, infection, illness, and pain of animal subjects.

(e) Psychologists use a procedure subjecting animals to pain, stress, or privation only when an alternative procedure is unavailable and the goal is justified by its prospective scientific, educational, or applied value.

(f) Psychologists perform surgical procedures under appropriate anesthesia and follow techniques to avoid infection and minimize pain during and after surgery.

(g) When it is appropriate that an animal's life be terminated, psychologists proceed rapidly, with an effort to minimize pain and in accordance with accepted procedures.

**8.10 Reporting Research Results**
(a) Psychologists do not fabricate data. (See also Standard 5.01a, Avoidance of False or Deceptive Statements.)

(b) If psychologists discover significant errors in their published data, they take reasonable steps to correct such errors in a correction, retraction, erratum, or other appropriate publication means.

**8.11 Plagiarism**
Psychologists do not present portions of another's work or data as their own, even if the other work or data source is cited occasionally.

**8.12 Publication Credit**
(a) Psychologists take responsibility and credit, including authorship credit, only for work they have actually performed or to which they have substantially contributed. (See also Standard 8.12b, Publication Credit.)

(b) Principal authorship and other publication credits accurately reflect the relative scientific or professional contributions of the individuals involved, regardless of their relative status. Mere possession of an institutional position, such as department chair, does not justify authorship credit. Minor contributions to the research or to the writing for publications are acknowledged appropriately, such as in footnotes or in an introductory statement.

(c) Except under exceptional circumstances, a student is listed as principal author on any multiple-authored article that is substantially based on the student's doctoral dissertation. Faculty advisors discuss publication credit with students as early as feasible and throughout the research and publication process as appropriate. (See also Standard 8.12b, Publication Credit.)

**8.13 Duplicate Publication of Data**
Psychologists do not publish, as original data, data that have been previously published. This does not preclude republishing data when they are accompanied by proper acknowledgment.

**8.14 Sharing Research Data for Verification**
(a) After research results are published, psychologists do not withhold the data on which their conclusions are based from other competent professionals who seek to verify the substantive claims through reanalysis and who intend to use such data only for that purpose, provided that the confidentiality of the participants can be protected and unless legal rights concerning proprietary data preclude their release. This does not preclude psychologists from requiring that such individuals or groups be responsible for costs associated with the provision of such information.

(b) Psychologists who request data from other psychologists to verify the substantive claims through reanalysis may use shared data only for the declared purpose. Requesting psychologists obtain prior written agreement for all other uses of the data.

**8.15 Reviewers**
Psychologists who review material submitted for presentation, publication, grant, or research proposal review respect the confidentiality of and the proprietary rights in such information of those who submitted it.

**9.    Assessment**

**9.01 Bases for Assessments**
(a) Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantiate their findings. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations. (See also Standards 2.01, Boundaries of Competence, and 9.06, Interpreting Assessment Results.)

(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations.

**9.02 Use of Assessments**
(a) Psychologists administer, adapt, score, interpret, or use assessment techniques, interviews, tests, or instruments in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques.

(b) Psychologists use assessment instruments whose validity and reliability have been established for use with members of the population tested. When such validity or reliability has not been established, psychologists describe the strengths and limitations of test results and interpretation.

(c) Psychologists use assessment methods that are appropriate to an individual's language preference and competence, unless the use of an alternative language is relevant to the assessment issues.

**9.03 Informed Consent in Assessments**
(a) Psychologists obtain informed consent for assessments, evaluations, or diagnostic services, as described in Standard 3.10, Informed Consent, except when (1) testing is mandated by law or governmental regulations; (2) informed consent is implied because testing is conducted as a routine educational, institutional, or organizational activity (e.g., when participants voluntarily agree to assessment when applying for a job); or (3) one purpose of the testing is to evaluate decisional capacity. Informed consent includes an explanation of the nature and purpose of the assessment, fees, involvement of third parties, and limits of confidentiality and sufficient opportunity for the client/patient to ask questions and receive answers.

(b) Psychologists inform persons with questionable capacity to consent or for whom testing is mandated by law or governmental regulations about the nature and purpose of the proposed assessment services, using language that is reasonably understandable to the person being assessed.

(c) Psychologists using the services of an interpreter obtain informed consent from the client/patient to use that interpreter, ensure that confidentiality of test results and test security are maintained, and include in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, discussion of any limitations on the data obtained. (See also Standards 2.05, Delegation of Work to Others; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.06, Interpreting Assessment Results; and 9.07, Assessment by Unqualified Persons.)

**9.04 Release of Test Data**
(a) The term *test data* refers to raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' notes and recordings concerning client/patient statements and behavior during an examination. Those portions of test materials that include client/patient responses are included in the definition of *test data*. Pursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release. Psychologists may refrain from releasing test data to protect a client/patient or others from substantial harm or misuse or misrepresentation of the data or the test, recognizing that in many instances release of confidential information under these circumstances is regulated by law. (See also Standard 9.11, Maintaining Test Security.)

(b) In the absence of a client/patient release, psychologists provide test data only as required by law or court order.

**9.05 Test Construction**
Psychologists who develop tests and other assessment techniques use appropriate psychometric procedures and current scientific or professional knowledge for test design, standardization, validation, reduction or elimination of bias, and recommendations for use.

**9.06 Interpreting Assessment Results**
When interpreting assessment results, including automated interpretations, psychologists take into account the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational, personal, linguistic, and cultural differences, that might affect psychologists' judgments or reduce the accuracy of their interpretations. They indicate any significant limitations of their interpretations. (See also Standards 2.01b and c, Boundaries of Competence, and 3.01, Unfair Discrimination.)

**9.07 Assessment by Unqualified Persons**
Psychologists do not promote the use of psychological assessment techniques by unqualified persons, except when such use is conducted for training purposes with appropriate supervision. (See also Standard 2.05, Delegation of Work to Others.)

**9.08 Obsolete Tests and Outdated Test Results**
(a) Psychologists do not base their assessment or intervention decisions or recommendations on data or test results that are outdated for the current purpose.

(b) Psychologists do not base such decisions or recommendations on tests and measures that are obsolete and not useful for the current purpose.

**9.09 Test Scoring and Interpretation Services**
(a) Psychologists who offer assessment or scoring services to other professionals accurately describe the purpose, norms, validity, reliability, and applications of the procedures and any special qualifications applicable to their use.

(b) Psychologists select scoring and interpretation services (including automated services) on the basis of evidence of the validity of the program and procedures as well as on other appropriate considerations. (See also Standard 2.01b and c, Boundaries of Competence.)

(c) Psychologists retain responsibility for the appropriate application, interpretation, and use of assessment instruments, whether they score and interpret such tests themselves or use automated or other services.

**9.10 Explaining Assessment Results**
Regardless of whether the scoring and interpretation are done by psychologists, by employees or assistants, or by automated or other outside services, psychologists take reasonable steps to ensure that explanations of results are given to the individual or designated representative unless the nature of the relationship precludes provision of an explanation of results (such as in some organizational consulting, preemployment or security screenings, and forensic evaluations), and this fact has been clearly explained to the person being assessed in advance.

**9.11. Maintaining Test Security**
The term *test materials* refers to manuals, instruments, protocols, and test questions or stimuli and does not include *test data* as defined in Standard 9.04, Release of Test Data. Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations, and in a manner that permits adherence to this Ethics Code.

**10.    Therapy**

**10.01 Informed Consent to Therapy**
(a) When obtaining informed consent to therapy as required in Standard 3.10, Informed Consent, psychologists inform clients/patients as early as is feasible in the therapeutic relationship about the nature and anticipated course of therapy, fees, involvement of third parties, and limits of confidentiality and provide sufficient opportunity for the client/patient to ask

questions and receive answers. (See also Standards 4.02, Discussing the Limits of Confidentiality, and 6.04, Fees and Financial Arrangements.)

(b) When obtaining informed consent for treatment for which generally recognized techniques and procedures have not been established, psychologists inform their clients/patients of the developing nature of the treatment, the potential risks involved, alternative treatments that may be available, and the voluntary nature of their participation. (See also Standards 2.01e, Boundaries of Competence, and 3.10, Informed Consent.)

(c) When the therapist is a trainee and the legal responsibility for the treatment provided resides with the supervisor, the client/patient, as part of the informed consent procedure, is informed that the therapist is in training and is being supervised and is given the name of the supervisor.

**10.02 Therapy Involving Couples or Families**
(a) When psychologists agree to provide services to several persons who have a relationship (such as spouses, significant others, or parents and children), they take reasonable steps to clarify at the outset (1) which of the individuals are clients/patients and (2) the relationship the psychologist will have with each person. This clarification includes the psychologist's role and the probable uses of the services provided or the information obtained. (See also Standard 4.02, Discussing the Limits of Confidentiality.)

(b) If it becomes apparent that psychologists may be called on to perform potentially conflicting roles (such as family therapist and then witness for one party in divorce proceedings), psychologists take reasonable steps to clarify and modify, or withdraw from, roles appropriately. (See also Standard 3.05c, Multiple Relationships.)

**10.03 Group Therapy**
When psychologists provide services to several persons in a group setting, they describe at the outset the roles and responsibilities of all parties and the limits of confidentiality.

**10.04 Providing Therapy to Those Served by Others**
In deciding whether to offer or provide services to those already receiving mental health services elsewhere, psychologists carefully consider the treatment issues and the potential client's/patient's welfare. Psychologists discuss these issues with the client/patient or another legally authorized person on behalf of the client/patient in order to minimize the risk of confusion and conflict, consult with the other service providers when appropriate, and proceed with caution and sensitivity to the therapeutic issues.

**10.05 Sexual Intimacies With Current Therapy Clients/Patients**
Psychologists do not engage in sexual intimacies with current therapy clients/patients.

**10.06 Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients**
Psychologists do not engage in sexual intimacies with individuals they know to be close relatives, guardians, or significant others of current clients/patients. Psychologists do not terminate therapy to circumvent this standard.

**10.07 Therapy With Former Sexual Partners**
Psychologists do not accept as therapy clients/patients persons with whom they have engaged in sexual intimacies.

**10.08 Sexual Intimacies With Former Therapy Clients/Patients**
(a) Psychologists do not engage in sexual intimacies with former clients/patients for at least two years after cessation or termination of therapy.

(b) Psychologists do not engage in sexual intimacies with former clients/patients even after a two-year interval except in the most unusual circumstances. Psychologists who engage in such activity after the two years following cessation or termination of therapy and of having no sexual contact with the former client/patient bear the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including (1) the amount of time that has passed since therapy terminated; (2) the nature, duration, and intensity of the therapy; (3) the circumstances of termination; (4) the client's/patient's personal history; (5) the client's/patient's current mental status; (6) the likelihood of adverse impact on the client/patient; and (7) any statements or actions made by the therapist during the course of therapy suggesting or inviting the possibility of a posttermination sexual or romantic relationship with the client/patient. (See also Standard 3.05, Multiple Relationships.)

**10.09 Interruption of Therapy**
When entering into employment or contractual relationships, psychologists make reasonable efforts to provide for orderly and appropriate resolution of responsibility for client/patient care in the event that the employment or contractual relationship ends, with paramount consideration given to the welfare of the client/patient. (See also Standard 3.12, Interruption of Psychological Services.)

APA Ethics Code 2002                                                                                    Page 16

**10.10 Terminating Therapy**
(a) Psychologists terminate therapy when it becomes reasonably clear that the client/patient no longer needs the service, is not likely to benefit, or is being harmed by continued service.

(b) Psychologists may terminate therapy when threatened or otherwise endangered by the client/patient or another person with whom the client/patient has a relationship.

(c) Except where precluded by the actions of clients/patients or third-party payors, prior to termination psychologists provide pretermination counseling and suggest alternative service providers as appropriate.


**History and Effective Date Footnote**

This version of the APA Ethics Code was adopted by the American Psychological Association's Council of Representatives during its meeting, August 21, 2002, and is effective beginning June 1, 2003. Inquiries concerning the substance or interpretation of the APA Ethics Code should be addressed to the Director, Office of Ethics, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242.  The Ethics Code and information regarding the Code can be found on the APA web site, http://www.apa.org/ethics.   The standards in this Ethics Code will be used to adjudicate complaints brought concerning alleged conduct occurring on or after the effective date.  Complaints regarding conduct occurring prior to the effective date will be adjudicated on the basis of the version of the Ethics Code that was in effect at the time the conduct occurred.

The APA has previously published its Ethics Code as follows:

American Psychological Association. (1953). Ethical standards of psychologists. Washington, DC: Author.

American Psychological Association. (1959). Ethical standards of psychologists. American Psychologist, 14, 279-282.

American Psychological Association. (1963). Ethical standards of psychologists. American Psychologist, 18, 56-60.

American Psychological Association. (1968). Ethical standards of psychologists. American Psychologist, 23, 357-361.

American Psychological Association. (1977, March). Ethical standards of psychologists. APA Monitor, 22-23.

American Psychological Association. (1979). Ethical standards of psychologists. Washington, DC: Author.

American Psychological Association. (1981). Ethical principles of psychologists. American Psychologist, 36, 633-638.

American Psychological Association. (1990). Ethical principles of psychologists (Amended June 2, 1989). American Psychologist, 45, 390-395.

American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. American Psychologist, 47, 1597-1611.

Request copies of the APA's Ethical Principles of Psychologists and Code of Conduct from the APA Order Department, 750 First Street, NE, Washington, DC 20002-4242, or phone (202) 336-5510.

Ethics Code 2002.doc  10/8/02

© 2002 American Psychological Association

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---



ERIC ROBERT DREW,                        )
                                         )
                                         )
          Plaintiff,                     )
                                         )   No.   CV 07-00726 SI
     vs.                                 )
                                         )
EQUIFAX INFORMATION SERVICES,            )
LLC, EXPERIAN INFORMATION                )   ROBERT MAISCH
SOLUTIONS, INC., et al,                  )   RECEIVED
                                         )   SFO
          Defendant.                     )
                                         )   NOV 2 8 2007
_____  )
                                             Calendared_____
                                             File_____


DEPOSITION OF ERIC R. DREW

Wednesday, October 31, 2007

Morning Session


REPORTED BY:

MARIANNE McNAIR
CSR NO. 7030


LUSK & SNYDER
CERTIFIED SHORTHAND REPORTERS
3715 MONTEREY BOULEVARD
OAKLAND, CALIFORNIA 94619
(510) 482-9991

```
 1   order reports from Old Republic, but other than that,
 2   no.
 3   Q.        How many years were you in the mortgage
 4   business?
 5   A.        Less than one.
 6   Q.        And you were, essentially, what, a mortgage
 7   banker or?
 8   A.        I was, I was a licensed real estate
 9   salesperson, so I was not a licensed broker.  And I
10   assisted a colleague of mine in his broker business,
11   running his operation.
12   Q.        And after you got this account, did you
13   contact Old Republic Credit Services about the
14   fraudulent accounts on this report?
15   A.        No, I did not.
16   Q.        Why not?
17   A.        Because this is simply a reflection of the
18   credit reports on my record.
19   Q.        In other words, you understand that Old
20   Republic publishes merge reports of what the three
21   major credit reporting agencies are reporting; is
22   that what you are saying?
23   A.        Generally referred to as a tri-merge, yes.
24   Q.        And so your understanding is, if you really
25   want to get the thing removed from your credit
```

15

1  record, you have to go to the credit reporting

2  agency that originally published it, is that?

3  A.       Not Old Republic, that is correct.

4  Q.       Now, Exhibit No. 2 is going to be a letter

5  to you from Capital One, dated October 24, 2003.

6  Exhibited No. 2.

7                         (Defendant's Exhibit 2

8                         marked for identification.)

9        MR. WEICKHARDT:  That has plaintiff's numbers

10 528 and 528A on it.

11 Q.       Okay.  And so did you receive this letter

12 within a few days of its date here, October 24th?

13 A.       No, I did not.

14 Q.       Was this your correct address at the time,

15 Mr. Drew?

16 A.       No, it was not.

17 Q.       What was your correct address at the time?

18 A.       My correct address was 19005 Old Vineyard Road

19 in Los Gatos, California 95033.

20 Q.       And when had you last lived on 14 West Main

21 Street?

22 A.       I vacated that apartment at the beginning of

23 September, I'm not exactly sure what date.

24 Q.       September 2003?

25 A.       That's correct.

                                                    16

1    Q.       Has anybody ever told you, to whom you

2    applied for credit, that that report of the Chase

3    account as lost or stolen on this credit report, had

4    any affect on any credit decision?

5            MR. KEATING:  That specific account?

6            MR. WEICKHARDT:  Yes.

7            THE WITNESS:  I don't believe so.

8            MR. WEICKHARDT:  Q.  Now, let's turn to the

9    next page.  And you will see account No. 10, which says

10   First USA Bank.

11           This is the one we are calling the Bank One

12   report, right?

13   A.       That's right.

14   Q.       And this one is reported at this time as

15   "closed/never late."

16           Do you have any reason to believe that the

17   reporting on this credit report ever negatively

18   affected your credit worthiness?

19   A.       Again, it shows an account that I never owned

20   reported on my credit report, which increases the

21   amount of accounts that it appears that I have applied

22   for and held, which I am under the understanding that

23   can negatively affect your credit score.

24   Q.       Again, in any subsequent applications for

25   credit, did any potential creditor ever tell you

53

1                         (Defendant's Exhibit 17

2                         marked for identification.)

3           MR. WEICKHARDT:   This is an Old Republic

4    report dated January 21st, '05.

5    Q.        Do you remember getting this one?

6    A.        I do.  I ordered this.

7    Q.        And the only thing I wanted to ask you about

8    this is, you know, you have said in relation to the

9    other Old Republic credit report, Exhibit 1, that we

10   looked at earlier, you didn't contact Old Republic

11   about any of the erroneous entries on the report?

12   A.        I don't believe so.

13   Q.        And the same would be true of this credit

14   report?

15   A.        Yes.

16          MR. WEICKHARDT:   And I have still another Old

17   Republic report, which will be Exhibit 18.

18                         (Defendant's Exhibit 18

19                         marked for identification.)

20          MR. WEICKHARDT:   And this one is dated

21   9/25/06.  And this is another credit report from your

22   records here.

23   Q.        You did receive a copy of this report at

24   some point, sir?

25   A.        Yes.

69

# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                ---oOo---

5 ERIC ROBERT DREW,

6            Plaintiff,

7    VS.               No. C07 0726 SI

8 EQUIFAX INFORMATION SERVICES, LLC,
EXPERIAN INFORMATION SOLUTIONS, INC.,

9 TRANSUNION LLC, NCAC, BANK OF AMERICA,
FLEET CREDIT CARD SERVICE,

10 AT&T UNIVERSAL CARD SERVICES,
CITIGROUP, BANK ONE CARDMEMBER SERVICES,

11 FIRST USA BANK, N.A. AND DOES 1-100,

12           Defendants.
_____/

13

         EXHIBITS 1 thru 14 TO:

14      DEPOSITION OF EVAN HENDRICKS

15           May 5, 2008

16

17                ROPERS, MAJESKI
                R E C E I V E D
                   SFO

18 Reported by:
ANNETTE M. SNYDER       MAY 1 4 2008

19 CSR NO. 1880
WEICKHARDT        Calendared_____

20                 File_____

21

22

23            LUSK & SNYDER
        3715 MONTEREY BOULEVARD

24      OAKLAND, CALIFORNIA 94619

25     (510)482-9991/FAX(510)482-1052

1    A.        Right.  I don't have access.  I can't get

2    inside.

3    Q.        I also assume, that you are -- that whatever

4    First Republic looked at, reported the card as lost or

5    stolen; correct?

6    A.        Yeah.  The information they, First -- or Old

7    Republic received, included this status of lost CRC,

8    lost credit card.

9    Q.        And as far as credit reports, now, other than

10   this one, do you know of any other reports later than

11   this, which reported the Chase account?

12   A.        I, sitting here now, I don't recall.

13   Q.        Okay.  And so I understand that, as far as the

14   credit reports that we have, the only -- the only way

15   that Chase account was reported, was as lost or stolen;

16   correct?

17   A.        That's principally how I recall it as being

18   reported, yes.

19   Q.        When an account is -- an account is reported

20   as lost or stolen, just in general, that is not going to

21   have a negative effect on somebody's credit score, is

22   it?

23   A.        Not in itself, yes.

24   Q.        How could it possibly have a negative effect?

25   A.        You are talking about some -- you have to, you

1  let's look at the -- I showed you Experians.  I am going

2  to have Equifax, February 26, marked as Exhibit 5.

3          (Whereupon, a February 16, 2004 Experian

4          Credit File marked Defendant's Exhibit 5 for

5          identification.)

6          MR. WEICKHARDT:  Q.  I will put that in front

7  of you, sir, Exhibit 5.

8          This is a credit report you looked at in terms

9  of -- in the course of preparing the report; right?

10  A.        Yes.

11  Q.        And you will find the Chase account on page 3,

12  of 6 there.  And you will see it's reported as lost or

13  stolen.

14  A.        On page 3 of 6?  There we go.  I'm looking for

15  Chase.  And there's Chase.  Lost or stolen, yes.

16  Q.        And your answer would be the same, that the

17  reporting of the account as lost or stolen on this

18  report would not have any negligent effect on Mr. Drew's

19  credit score?

20  A.        No.  There is no negative status, and there is

21  no balance due or anything like that; no negative

22  effect.

23  Q.        If you will turn to the next page, you will

24  see the Bank One account identified under First USA,

25  4388?

**EXHIBIT D**

1   John B. Keating, Esq. (SBN: 148729)
2   2995 Woodside Road, Suite 350
    Post Office Box 620622
3   Woodside, California 94062-0622
    Telephone: (650) 851-5900
4   Facsimile: (650) 851-5912
    E-mail: jbkeating@aol.com

5   Attorney for Plaintiff
    ERIC ROBERT DREW

6

ROPERS, MAJESKI
R E C E I V E D
SFO

APR 0 8 2008

Calendared
File

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

                       SAN FRANCISCO DIVISION
10

11   ERIC ROBERT DREW,                    )   Case No.: CV 07-00726 SI
                                          )
12                    Plaintiff,          )   PLAINTIFF'S DESIGNATION OF
                                          )   EXPERTS
13              v.                        )
                                          )
14   EQUIFAX INFORMATION SERVICES LLC,    )
     EXPERIAN INFORMATION SOLUTIONS,      )   Trial Date:    October 20, 2008
15   INC., TRANSUNION LLC, NCAC, BANK OF  )   Time:          8:30 a.m.
     AMERICA, FLEET CREDIT CARD SERVICE,  )   Courtroom:     10, 19th Floor
16   AT&T UNIVERSAL CARD SERVICES,        )
     CITIGROUP, BANK ONE CARDMEMBER       )   The Honorable Susan Illston
17   SERVICES, FIRST USA BANK, N.A., and  )
     DOES 1-100,                          )
18   and                                  )
     FIA CARD SERVICES, N.A. [Previously Doe )
19   1], CITIBANK (SOUTH DAKOTA) N.A.     )
     [Previously Doe 2], CHASE BANK USA, N.A. )
20   [Previously Doe 3]                   )
                                          )
21                    Defendants.         )
                                          )
22   _____)

23   TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

24          Pursuant to Federal Rules of Civil Procedure Rule 26(a)(2) Plaintiff Eric Robert

25   Drew  hereby makes the following expert witness disclosure regarding expert witnesses who may

26   be called to testify at trial in this matter.

27       (1)    Retained Expert Evan D. Hendricks:

28              Plaintiff designates Evan D. Hendricks as a retained expert witness who

1    will testify at trial of this matter.

2         Mr. Hendricks' mailing address and contact telephone numbers are:

3         Evan D. Hendricks
          P.O. Box 302
4         Cabin John, MD 20818
          (310) 229-7002
5         Facsimile:  (310) 229-8011

6         A copy of Mr. Hendricks' report summarizing his conclusions is attached hereto

7    as Exhibit A.

8         Mr. Hendricks is available and sufficiently familiar with the facts and documents

9    of the case site to give a meaningful oral deposition concerning his opinions and their bases.

10        Mr. Hendricks' rate for study and trial and deposition testimony is $250.00 per

11   hour or a minimum of $1,000 per day, plus reasonable travel time, costs and expenses.

12        A copy of Mr. Hendricks' curriculum vitae is attached to his report appended as

13   Exhibit A hereto at page 42-43 of the report.  His background and qualifications are further set

14   forth at pages 1-4 of the report.

15        A listing of the litigation testimony and reports of Mr. Hendricks within the last

16   four years is included at pages 6-8 of the report and congressional testimony and FTC testimony

17   is listed at pages 3-4 and 43 or the report.  Mr. Hendricks' publications are listed at page 2 of the

18   report and 43-44 of the report.

19        A listing of materials and information considered by Mr. Hendricks is included at

20   pages 39-41 of his report.

21        Mr. Hendricks expected to be called for expert testimony as to his opinions and

22   conclusions as outlined in his report and also including industry practices and the practices and

23   conduct of the specific defendants both generally and regarding the specific Eric Drew identity

24   theft circumstances concerning: the nature and purpose of credit scores and credit reports, the

25   history of the credit report inaccuracy problem, the responses of the FCRA's overseers and the

26   history and prevalence of identity theft and its impact on individual victims and on credit report

27   accuracy, the issuance of credit cards and verification of the identity of the applicant, the

28   investigation and handling of application fraud and identity theft circumstances, the credit

1  reporting, the fraud and dispute investigation, notification, verification and response of the credit

2  information furnishers and credit agencies, the correction of the credit reports, and the

3  communications with and impact on the victim.

4       (2)     Non-retained Medical Provider Experts:

5       Plaintiff anticipates testimony at trial by non-retained treating physicians,

6  psychotherapists and other medical providers, whose testimony may rely upon their expertise and

7  opinions including based on observations during treatment.  Plaintiff reserves the right to present

8  and rely upon the expertise and expert opinions reached by such non-retained treating medical

9  providers but in this expert disclosure does not provide specifically prepared reports and resumes

10  for such non-retained experts.

11       Pursuant to Federal Rules of Civil Procedure Rule 26(a)(2) plaintiff identifies and

12  discloses such witnesses including David Spiegel, M.D., Cheryl Gore-Felton, M.D. and

13  Christopher Sato-Perry, M.A., Psy.D .  Depositions have been taken and resumes and diagnosis

14  opinion documents have been previously produced for the key current treating psychiatrist and

15  psychotherapists who may testify at trial herein.  A copy of the previously produced resume for

16  David Spiegel, including his address and phone number contact information, is appended hereto

17  as Exhibit B and his diagnosis document is appended hereto as Exhibit C.  A copy of the

18  previously produced resume for Cheryl Gore-Felton, including her address and phone number

19  contact information, is appended hereto as Exhibit D and a diagnosis document is appended

20  hereto as Exhibit E.  A copy of the previously produced diagnosis document of Christopher Sato-

21  Perry is appended hereto as Exhibit F and includes his address and phone number contact

22  information.  [The medical records included at Exhibit C, E and F are hereby designated as

23  "Confidential" pursuant to the Protective Order controlling documents in this matter and may not

24  be released or distributed except in compliance with the Protective Order.]

25       (3)     Supplemental and Rebuttal Experts:

26       Plaintiff reserves the right to supplement this disclosure with further designation

27  and further written reports or supplemental report of Mr. Hendricks after discovery and

28  investigation is completed.  Plaintiff has been unable to complete expert consultation, retention

Drew v. Equifax, et al.          PLAINTIFF'S DESIGNATION OF  EXPERTS
USDC, N.D. Calif No. CV 07-00726 SI

Page 3

1  and disclosure in this case because the parties have not yet fully exchanged documents and other

2  discovery, and therefor Plaintiff reserves the right to later designate and call at trial experts

3  regarding the issues and information that may be disclosed or if Defendants provide additional

4  discovery responses and document and witness disclosure or identify defendant employee

5  personnel and subjects to be addressed at trial.

6          Plaintiff may designate supplemental or rebuttal experts who will express an

7  opinion on a subject covered by an expert designated by Defendants or addressed in a report of

8  Defendant experts or arising in the course of expert discovery or general discovery not yet

9  completed, and reserves the right to present rebuttal experts at trial

10          Plaintiff reserves the right to call as expert witnesses anyone disclosed by any

11  other party in this action and anyone whose testimony is an expert opinion who has been deposed

12  or whose records have been subpoenaed in this action.

13          Plaintiff also reserves all rights pursuant to Federal Rules of Civil Procedure and

14  Rules of Evidence, as well as any other constitutional, statutory or common law rights he may

15  have to later name other expert witnesses before or during trial, and to call to testify at the trial

16  experts not named, whose testimony is needed to reflect or rebut the testimony of experts or other

17  testimony or evidence presented by the Defendants in this action.

18

19  Dated: April 1, 2008

20

21  John B. Keating
    Attorney for Plaintiff Eric Robert Drew

22

23

24

25

26

27

28

---

Drew v. Equifax, et al.                    PLAINTIFF'S DESIGNATION OF EXPERTS
USDC, N.D. Calif No. CV 07-00726 SI

**PROOF OF SERVICE BY MAIL**

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

I, the undersigned, am employed in the County of San Mateo, State of California. I am over the age of eighteen years and not a party to the within case; my business address is 2995 Woodside Road, Suite 350, P.O. Box 620622, Woodside, California 94062. On this day I caused to be served the following document(s):

PLAINTIFF'S DESIGNATION OF EXPERTS

by mail by placing a true copy(ies) in a sealed envelope with postage thereon fully prepaid for deposit with the United States Postal Service following the regular business practices of my office for collection and processing for mailing, such practices of which I am readily familiar, addressed as follows:

| | |
|---|---|
| George G. Weickhardt<br>Pamela J. Zanger<br>Ropers, Majeski, Kohn & Bentley PC<br>201 Spear Street, Suite 1000<br>San Francisco CA 94105-1667<br>Fax: (415) 972-6301 | Attorneys for Chase Bank USA, N.A., as successor-in-interest to First USA Bank, N.A., and Bank One Cardmember Services |
| David L. Wallach<br>Tracy Strong<br>JONES DAY<br>555 California Street, 26th Floor<br>San Francisco, CA 94104-1602<br>Fax: (415) 875-5700 | Attorneys for Experian Information Solutions, Inc. |
| Marcos D. Sasso<br>Lisa M. Simonetti<br>STROOCK & STROOCK & LAVAN LLP<br>2029 Century Park East, Suite 1800<br>Los Angeles, CA 90067-3086<br>Fax: (310) 556-5959 | Attorneys for Citigroup Inc., AT&T Universal Card Services and Citibank (South Dakota), N.A. |
| Thomas P. Quinn<br>NOKES & QUINN<br>450 Ocean Avenue<br>Laguna Beach, CA 92651-2358<br>Fax: (949) 376-3070 | Attorney for Equifax Information Services LLC |

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S DESIGNATION OF EXPERTS